**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**HUNTINGTON DIVISION**

**DORIST F. BONECUTTER, III,**

      **Plaintiff,**

**v.**                                  **Case No.: 3:11-cv-00576**

**MICHAEL J. ASTRUE,
Commissioner of the Social
Security Administration,**

      **Defendant.**

## PROPOSED FINDINGS AND RECOMMENDATIONS

This action seeks a review of the decision of the Commissioner of the Social Security Administration (hereinafter "Commissioner") denying Plaintiff's applications for a period of disability and disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. This case is assigned to the Honorable Robert C. Chambers, United States District Judge, and was referred to the undersigned United States Magistrate Judge by standing order for submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are the parties' cross motions for judgment on the pleadings as articulated in their briefs. (ECF Nos. 10, 11).

The undersigned has fully considered the evidence and the arguments of counsel. For the following reasons, the undersigned recommends that Plaintiff's motion for remand be granted, that the Commissioner's motion be denied, and that this case be

1

remanded for further proceedings pursuant to sentence four of 42 U.S.C. § 405(g).

## I.    Procedural History

Plaintiff, Dorist F. Bonecutter, III (hereinafter "Claimant"), filed applications for SSI and DIB on February 8, 2008, alleging a disability onset date of December 31, 2007[1] due to a "[s]teel rod in left leg, screw in right ankle, cut tendons on forearm and wrist. I have broken glass in right hand and it is not removable." (Tr. at 112, 115, 141). In May 2008, Claimant added stomach problems, neck pain, and migraine headaches to his list of impairments and subsequently reported an altercation with a police officer that left him with broken ribs and psychiatric complaints. (Tr. at 177, 203). The Social Security Administration (hereinafter "SSA") denied Claimant's application initially and upon reconsideration. (Tr. at 11). Claimant filed a request for an administrative hearing, which was held on January 20, 2010 before the Honorable Andrew J. Chwalibog, Administrative Law Judge (hereinafter "ALJ"). (Tr. at 25-50). By written decision dated February 18, 2010, the ALJ found that Claimant was not disabled as defined in the Social Security Act. (Tr. at 11–22). The ALJ's decision became the final decision of the Commissioner on June 21, 2011 when the Appeals Council denied Claimant's request for review. (Tr. at 1–3). Claimant timely filed the present civil action seeking judicial review pursuant to 42 U.S.C. §405(g). (ECF No. 2). The Commissioner filed an Answer and a Transcript of the Administrative Proceedings, and both parties filed memoranda in support of judgment on the pleadings. (ECF Nos. 7, 8, 10, 11). Consequently, the matter is fully briefed and ready for resolution.

---

[1] Actually, the alleged disability onset date is unclear. The applications indicate that December 31, 2007 is the claimed date of disability onset, and consistent with that date, the oldest medical record in evidence is dated January 17, 2007. (Tr. at 112, 115, 242). However, a field office report and an adult disability report form identify the onset date as December 31, 2005. (Tr. at 137, 142). The ALJ used the 2005 date both at the administrative hearing and in his written decision. (Tr. at 11, 29).

## II.   <u>Claimant's Background</u>

Claimant was 42 years old at the time he filed his applications for benefits and 44 years old at the time of his administrative hearing. (Tr. at 27). He dropped out of school in the eighth grade and never received a GED; however, he could read and write in English. (Tr. at 28-29). Claimant had prior work experience as a deck hand and a tow boat operator. (Tr. at 293-94).

## III.   <u>Summary of ALJ's Decision</u>

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability. *See Blalock v. Richardson,* 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. 423(d)(1)(A).

The Social Security regulations establish a five step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary and benefits are denied. 20 C.F.R. §§ 404.1520, 416.920. The first step in the sequence is determining whether a claimant is currently engaged in substantial gainful employment. *Id.* §§ 404.1520(b), 416.920(b). If the claimant is not, then the second step requires a determination of whether the claimant suffers from a severe impairment. *Id.* §§ 404.1520(c), 416.920(c). If severe impairment is present, the third inquiry is whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4 (the "Listing"). *Id.* §§ 404.1520(d), 416.920(d). If the impairment does, then the claimant is found disabled and awarded benefits.

However, if the impairment does not meet or equal a listed impairment, the adjudicator must determine the claimant's residual functional capacity ("RFC"), which is the measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* §§ 404.1520(e), 416.920(e). After making this determination, the next step is to ascertain whether the claimant's impairments prevent the performance of past relevant work. *Id.* §§ 404.1520(f), 416.920(f). If the impairments do prevent the performance of past relevant work, then the claimant has established a *prima facie* case of disability, and the burden shifts to the Commissioner to demonstrate, as the final step in the process, that the claimant is able to perform other forms of substantial gainful activity, when considering the claimant's remaining physical and mental capacities, age, education, and prior work experiences. *Id.* §§ 404.1520(g), 416.920(g); *see also McLain v. Schweiker,* 715 F.2d 866, 868-69 (4th Cir. 1983). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger,* 538 F.2d 572, 574 (4th Cir. 1976).

Here, the ALJ determined as a preliminary matter that Claimant met the insured status for disability insurance benefits through December 31, 2010. (Tr. at 13, Finding No 1). At the first step of the sequential evaluation, the ALJ confirmed that Claimant had not engaged in substantial gainful activity since the time of the alleged onset of disability. (*Id.*, Finding No. 2). Turning to the second step of the evaluation, the ALJ determined that Claimant had the following severe impairments: "history of multiple accidents resulting in a right ankle fracture, status post open reduction and internal

4

fixation (ORIF) with possible post traumatic osteoarthritis, left femur fracture, status post ORIF with possible left knee and hip post traumatic osteoarthritis, right forearm and complex laceration with tendon injury, status post surgical intervention and neck pain secondary to cervical spine fracture, major depression, anxiety disorder, and alcohol dependence (sustained partial remission)." (Tr. at 13-14, Finding No. 3). Under the third inquiry, the ALJ determined that Claimant did not have an impairment or combination of impairments that met or medically equaled any of the impairments contained in the Listing. (Tr. at 14-16, Finding No. 4). Accordingly, the ALJ assessed Claimant's RFC, finding that Claimant had:

> the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except that he can only occasionally perform overhead reaching with the dominant upper extremity, and should avoid concentrated exposure to extreme cold and vibration.  The claimant is limited to uncomplicated work like activities with limited interaction with others.

 (Tr. at 16-20, Finding No. 5).

The ALJ then reviewed Claimant's past work experience, age, and education in combination with his RFC to determine his ability to engage in substantial gainful activity. (Tr. at 20-21, Finding Nos. 6–10). The ALJ considered that (1) Claimant was unable to perform any past relevant work; (2) he was born in 1965 and was defined as a younger individual, age 18–49, on the alleged disability onset date; (3) he had limited education and could communicate in English; and (4) transferability of job skills was not an issue because the Medical-Vocational Rules supported a finding that Claimant was "not disabled." (Tr. at 20, Finding Nos. 6–9). Given these factors, and relying upon the testimony of a vocational expert, the ALJ determined that Claimant could perform jobs at the light and sedentary exertional levels, which were available in significant

numbers in the national economy. (Tr. at 20-21, Finding No. 10). At the light exertional level, the ALJ found that Claimant could perform unskilled hand packing and vehicle detailing jobs. (*Id.*). At the sedentary level, the ALJ found that Claimant could work as a an unskilled bench worker or unskilled assembler. (*Id.*) Therefore, the ALJ concluded that Claimant was not disabled and, thus, was not entitled to benefits. (Tr. at 21-22, Finding No. 11).

## IV.    **Claimant's Challenges to the Commissioner's Decision**

Claimant asserts that the Commissioner's decision is not supported by substantial evidence because the ALJ failed to consider the opinion of an examining medical source, Dr. James Wagner. The record reflects that on February 8, 2008, at the request of the West Virginia Department of Health and Human Services ("WVDHHR"), Dr. Wagner performed a physical examination of Claimant and completed a form assessing his ability to work on a full-time basis. (Tr. at 225-28). Dr. Wagner opined that Claimant was not "employable" due to the severity and chronicity of his musculoskeletal pain. (*Id.*). Claimant argues that the ALJ had an obligation to consider and weigh all of the medical opinions in the record, but instead, he merely adopted the opinions of Dr. James Egnor, a non-examining agency consultant, and completely ignored those of Dr. Wagner.  (ECF No. 10 at 9-11).

To the contrary, the Commissioner contends that the ALJ did consider Dr. Wagner's findings, explicitly mentioning them in the written decision. According to the Commissioner, the ALJ had no duty to afford great weight to Dr. Wagner's opinion regarding Claimant's inability to work, because the determination of whether a claimant is under a disability is statutorily reserved to the Commissioner. Finally, the Commissioner argues that the ALJ adopted the opinion of Dr. James Egnor, who plainly

considered and rejected Dr. Wagner's opinions. Therefore, the ALJ properly reviewed, assessed, and weighed the opinions of the medical sources. (ECF No. 11 at 14-15).

## V.   <u>Relevant Evidence</u>

The undersigned has reviewed the Transcript of Proceedings in its entirety, including all of the medical records, and summarizes below Claimant's medical treatment and evaluations to the extent that they are relevant to the issue in dispute.

### A.   **Treatment Records Relating to Claimant's Musculoskeletal Impairments**

Between January 2007 and August 2008, Claimant saw Dr. M. C. Shah approximately once each month for routine evaluation and pain medication refills. (Tr. at 229-242, 275-285). Dr. Shah's handwritten notes are largely indecipherable, but the records suggest that Claimant's complaints of musculoskeletal pain were chronic, averaging an 8 on a 10-point pain scale, and he regularly received Lortab to control his pain.

On March 8, 2008, Claimant presented to the Emergency Room at Pleasant Valley Hospital complaining of a headache. (Tr. at 247). He reported to the Emergency Room physician that he had a history of a neck fracture; surgery on both legs; surgery on his right eye; two surgeries on his right arm; and a surgery on his right hand. He took Lortab as needed for chronic pain. (*Id.*). Claimant was given medication for his headache and discharged. (Tr. at 249).

Claimant returned to Pleasant Valley Hospital on March 12, 2009 in the custody of the West Virginia State Police. (Tr. at 361). He had abrasions to his forehead, nose, and hands, as well as pain in his right ribs and flank. He provided the Emergency Room physician with his surgical history and stated that he took four Lortab each day for pain

control. (Tr. at 364). Claimant was diagnosed with a non-displaced fracture of his right seventh rib anteriorly. His wounds were cleaned and treated; he was given a tetanus shot and an antibiotic and was discharged.  (Tr. at 365).

On August 10, 2009, Claimant again went to the Emergency Room complaining of a knot on his left elbow that may have been caused by a spider bite. (Tr. at 369). Ten days later, he was evaluated by Dr. Clifford Roberson, an orthopedic surgeon, who diagnosed Claimant with olecranon bursitis of his left elbow. (Tr. at 382). Dr. Roberson aspirated a cloudy fluid from the bursa and provided Claimant with a prescription for a Medrol Dosepak. (*Id.*). Claimant's elbow did not improve; so, on August 31, 2009, Dr. Roberson performed a surgical excision of Claimant's olecranon bursa and a bony spur. (Tr. at 385).

### B.    Consulting Medical Source Evaluations

On February 5, 2008, Dr. James P. Wagner performed a physical examination of Claimant to evaluate his eligibility for Medicaid benefits. (Tr. at 225-228). Claimant reported that he had fallen out of a tree stand four or five years earlier and fractured his neck, shoulder, and leg. He had also fallen off a ladder and hit glass, some of which was still in his right hand. Finally, Claimant indicated that he had "hardware" in his right ankle and his left leg hurt "a lot." (*Id.* at 225). Dr. Wagner recorded Claimant's statement of incapacity/disability to be "chronic pain from injuries and fractures." (*Id.* at 226). He observed Claimant's gait to be normal, but his posture to be "guarded." Claimant's physical examination was unremarkable except for anxiety and "much pain in neck, right shoulder, both legs. He also has glass in right hand." (*Id.* at 227). Dr. Wagner described the pain as constant and diagnosed Claimant with post fracture pain. He opined that Claimant suffered too much pain to work full-time and that the pain

8

would prevent Claimant from working at any occupation for a year. In summary, Dr. Wagner wrote:

> Fell out of a tree stand 4-5 years ago and fractured his neck, hurt his right shoulder, and right ankle has been hurt since age 16. He has rod in right leg-ankle. He also broke his left leg at age 16 and has hardware in ankle, left leg ... he fell off a ladder and has had 3 surgeries of his right arm and the right arm hurts all the time. I don't think he is employable.

(*Id.* at 228).

On June 5, 2008, Dr. Kip Beard performed an internal medicine examination at the request of Disability Determination Services. (Tr. at 260-65). Dr. Beard documented Claimant's primary complaints as bilateral leg injuries and right arm injury. Claimant provided history regarding his current impairments, indicating that he had been involved in a motor vehicle accident twenty years earlier and had sustained fractures of his left femur and right ankle, which required surgery. In addition, about nine years earlier, he had fallen off a ladder and fell into a glass window, causing lacerations of his right arm. This injury required a surgery to repair tendons in his arm and two surgeries to remove glass from his hand. Claimant also described an accident that occurred seven or eight years earlier in which he fell out of a tree stand and broke his neck and shoulder. Claimant indicated that he currently suffered from constant pain in his left knee, right ankle, neck, and shoulder, as well as numbness and pain in his first through third fingers of his right hand. He reported receiving pain medication, but denied any recent x-rays or physical therapy. According to Claimant, he had no health insurance and could not afford the care. Claimant advised that the pain from his prior injuries made it difficult for him to climb, stand for prolonged periods of time, walk, grasp with his right hand, use tools, reach overhead, lift, carry, and turn his head. (*Id.* at 260-61).

Dr. Beard performed a physical examination of Claimant. He documented that Claimant had a limp on the right side, but was able to walk without ambulatory aids, could stand unassisted, arise from a seated position, and get on and off the examination table without difficulty. When examining the musculoskeletal system, Dr. Beard noted that Claimant had some mild cervical spine pain; a mildly painful shoulder with mild intermittent crepitus; tenderness on palpation of the soft tissue of the right hand between the second and third fingers; a mildly painful left knee with intermittent patellofemoral crepitus; and tenderness of the right ankle with palpable hardware and intermittent crepitus. Claimant's grip strength was significantly weaker with the right hand, but there was no evidence of neurological impairment or atrophy. (*Id.* at 263-64). Dr. Beard diagnosed right ankle and left femur fractures status post open reduction internal fixation, right arm tendon laceration status post corrective surgery with questionable carpal tunnel syndrome, and history of cervical spine fracture with chronic neck pain and right shoulder fracture with possible posttraumatic osteoarthritis. Dr. Beard summarized by noting that Claimant had ongoing left knee and right ankle pain with a leg length discrepancy of one centimeter. (*Id.* at 264-65). Claimant complained of numbness in his right arm consistent with the median nerve distribution, but had no evidence of atrophy. Dr. Beard also found some motion loss of the cervical spine and some tenderness in the shoulder without obvious weakness or atrophy. (*Id.*)

Based upon Dr. Beard's findings, Dr. A. Rafael Gomez completed a Physical Residual Functional Capacity Assessment form on June 18, 2008. (Tr. at 267-274). Dr. Gomez found that Claimant could occasionally lift/carry 50 pounds and frequently lift/carry up to 25 pounds. (Tr. at 284). Claimant could stand or walk six hours a day; sit for six hours a day; and was unlimited in his ability to push or pull. (*Id.*). Claimant's

postural limitations allowed only occasional balancing. (Tr. at 269). Dr. Gomez found that Claimant was not subject to any manipulative, visual, communicative limitations, or environmental limitations. (*Id.* at 270–71). Dr. Gomez commented that Claimant had no significant range of motion loss and no neurological complications. Accordingly, he concluded that Claimant was capable of performing medium level exertional work. (Tr. at 272).

On March 11, 2009, Dr. Beard performed a second physical examination of Claimant. (Tr. at 298-303). The results of this examination were essentially the same as the first one. Based upon the findings from Dr. Beard's 2009 examination, Dr. James Egnor completed a Physical Residual Functional Capacity Assessment form on March 27, 2009. (Tr. at 304-11). Dr. Egnor found Claimant capable of occasionally lifting/carrying up to 20 pounds and frequently lifting/carrying 10 pounds. He felt Claimant could stand or walk six hours a day; sit for six hours a day; and was unlimited in his ability to push or pull. (Tr. at 305). Dr. Egnor found no postural, visual, or communicative limitations, but opined that Claimant was limited in his ability to reach in all directions including overhead and should avoid concentrated exposure to extreme cold and vibration. Dr. Egnor directly addressed the differences between his opinions and those of Dr. Wagner, indicating that he rejected Dr. Wagner's opinion because the objective medical records did not reflect that Claimant was receiving medication or other treatment for his pain. (Tr. at 310).

## VI.  **Scope of Review**

The issue before the Court is whether the final decision of the Commissioner is based upon an appropriate application of the law and is supported by substantial evidence. In *Blalock v. Richardson,* the Fourth Circuit Court of Appeals defined

"substantial evidence" to be:

> [E]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Blalock v. Richardson*, 483 F.2d 773, 776 (4th Cir. 1972) (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). This Court is not charged with conducting a *de novo* review of the evidence. Instead, the Court's function is to scrutinize the totality of the record and determine whether substantial evidence exists to support the conclusion of the Commissioner. *Hays v. Sullivan,* 907 F.2d 1453, 1456 (4th Cir. 1990). The decision for the Court to make is "not whether the claimant is disabled, but whether the ALJ's finding of no disability is supported by substantial evidence." *Johnson v. Barnhart,* 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig v. Chater,* 76 F.3d 585, 589 (4th Cir. 2001)). If substantial evidence exists, then the Court must affirm the decision of the Commissioner "even should the court disagree with such decision." *Blalock,* 483 F.2d at 775.

**VII.   <u>Analysis</u>**

Having thoroughly considered the evidence and the arguments of counsel, the undersigned **FINDS** that the ALJ did not properly address Dr. Wagner's opinion as required by the Social Security regulations and rulings. Moreover, the undersigned **FINDS** that the ALJ's error was not harmless because (1) by failing to consider and weigh the opinion, the ALJ disregarded his duty to resolve conflicts in the evidence; and (2) by ignoring Dr. Wagner's opinion, the ALJ performed an incomplete credibility analysis.

When evaluating a claimant's application for disability benefits, the ALJ "will always consider the medical opinions in [the] case record together with the rest of the relevant evidence [he] receives." 20 C.F.R. §§ 404.1527(b), 416.927(b). Medical opinions are defined as "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [a claimant's] impairment(s), including [his] symptoms, diagnosis and prognosis, what [he] can still do despite [his] impairment(s), and [his] physical or mental restrictions." *Id.* §§ 404.1527(a)(2), 416.927(a)(2). In the context of determining an individual's RFC, the ALJ must always consider and address medical source opinions and "[i]f the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted." SSR 96-8p, 1996 WL 374184 *7. If conflicting medical opinions are present in the record, the ALJ must resolve the conflicts by weighing the medical source statements and providing an appropriate rationale for accepting, discounting, or rejecting the opinions. *See Diaz v. Chater,* 55 F.3d 300, 306 (7th Cir. 1995). A minimal level of articulation of the ALJ's assessment of the evidence is "essential for meaningful appellate review," given that "when the ALJ fails to mention rejected evidence, 'the reviewing court cannot tell if significant probative evidence was not credited or simply ignored.'" *Zblewski v. Schweiker,* 732 F.2d 75, 79 (7th Cir. 1984) (citing *Cotter v. Harris,* 642 F.2d 700, 705 (3rd Cir. 1981)).

Medical source opinions on issues reserved to the Commissioner are treated differently than other medical source opinions; they are never entitled to controlling weight or special significance, because "giving controlling weight to such opinions would, in effect, confer upon the [medical] source the authority to make the determination or decision about whether an individual is under a disability, and thus

would be an abdication of the Commissioner's statutory responsibility to determine when an individual is disabled."[2] SSR 96-5p, 1996 WL 374183 *2. However, these opinions must always be carefully considered, "must never be ignored," and should be assessed for their supportability and consistency with the record as a whole. *Id.*

> The adjudicator is required to evaluate all evidence in the case record that may have a bearing on the determination or decision of disability, including opinions from medical sources about issues reserved to the Commissioner. If the case record contains an opinion from a medical source on an issue reserved to the Commissioner, the adjudicator must evaluate all the evidence in the case record to determine the extent to which the opinion is supported by the record. In evaluating the opinions of medical sources on issues reserved to the Commissioner, the adjudicator must apply the applicable factors in 20 CFR 404.1527(d) and 416.927(d).[3]

*Id.* at *3.

In this case, the ALJ encountered two medical source opinions that were plainly at odds. Dr. James Wagner, an examining state consultant, opined that Claimant was unable to "work full-time" due to severe and chronic post fracture pain. On the other hand, Dr. James Egnor, a non-examining agency consultant, expressly disagreed with Dr. Wagner's opinion regarding the severity of Claimant's pain, emphasizing that Claimant received "no pain meds or treatment for [his] condition."[4] (Tr. at 310). In Dr. Egnor's view, Claimant was capable of light level exertional work with some environmental limitations. (Tr. at 311). Consequently, the regulations, rulings, and

---

[2] Examples of issues reserved to the Commissioner include "whether an individual's impairment(s) meets or is equivalent in severity to the requirements of any impairment(s) in the listings ... what an individual's RFC is ... whether an individual's RFC prevents him or her from doing past relevant work ... and whether an individual [is unable to work or] is 'disabled' under the Social Security Act. . ." SSR 96-5p, 1996 WL 374183  *2.

[3]The applicable factors are now found at 20 C.F.R. §§ 404.1527(c), 419.927(c).

[4] It should be noted that this statement is incorrect.  The record clearly documents that Claimant took four Lortab tablets and Ativan each day to treat his pain and anxiety.

relevant case law required the ALJ to (1) address the conflicting opinions, (2) resolve the conflicts by examining the remainder of the evidence and assigning weight to each opinion, and (3) adequately explain the reasons for his conclusions.[5] *Id.* at *6; 20 C.F.R. §§ 404.1527(e)(2)(ii), 416.927(e)(2)(ii); *See also Coldren v. Astrue,* 2011 WL 4352500 *15 (N.D. Iowa Sept. 15, 2011).

As noted by the Commissioner, the ALJ did mention Dr. Wagner's examination in the written decision. (Tr. at 14, 17). The ALJ observed that Dr. Wagner found Claimant's eyesight to be essentially normal and stated that "a February 2008 medical report from Dr. Wagner indicated the claimant ambulated with a normal gait and posture."[6] (Tr. at 17). Nonetheless, the ALJ wholly and inexplicably failed to acknowledge the key opinions expressed by Dr. Wagner—that Claimant suffered from chronic post fracture pain and the pain was sufficiently severe to prevent Claimant from working at any occupation for at least one year. Although this opinion encroached on an administrative issue reserved to the Commissioner, the ALJ was still obligated to address it and articulate why the opinion was either supported or not supported by the remaining record. The ALJ clearly erred when he failed to comply with this procedural requirement.

Having determined that the ALJ erred, the undersigned must next consider whether the error was harmless. An error is harmless when it "clearly had no bearing on

---

[5] The record indicates that Dr. Wagner treated Claimant in the distant past for injuries received in one of the accidents and as a family physician; however, Dr. Wagner did not have an ongoing treatment relationship with Claimant at the time he performed Claimant's physical examination in 2008. (Tr. at 145). Therefore, Dr. Wagner apparently was not acting as a treating source when he provided his opinion to the WVDHHR as part of Claimant's eligibility evaluation for Medicaid benefits.

[6] This representation of Dr. Wagner's findings is only partially correct. Dr. Wagner documented that Claimant's gait was "normal," but found his posture to be "guarded."

the procedure used or the substance of the decision reached." *Morgan v. Barnhart,* 142 Fed. Appx 716, 723 & n. 6 (4th Cir. 2005) (unpublished) (quoting *Ngarurih v. Ashcroft,* 371 F.3d 182, 190, n.8 (4th Cir. 2004); *See also Morris v. Bowen*, 864 F.2d 333, 335 (5th Cir. 1988) ("Procedural perfection in administrative proceedings is not required. This court will not vacate a judgment unless the substantial rights of a party have been affected"). If Dr. Wagner's opinion had been cumulative of other opinions addressed and rejected by the ALJ, or if it was consistent with the ALJ's ultimate RFC and disability findings, then the ALJ's failure to analyze and discuss the opinion would have constituted harmless error. However, Dr. Wagner's opinion was not cumulative and differed significantly from the findings ultimately made by the ALJ. In addition, it was the only record in evidence prepared by Dr. Wagner.  As such, it was not contradicted by Dr. Wagner's own treatment records and was unequivocal in its conclusion that the severity and persistence of Claimant's pain rendered him unable to work at any occupation. The Commissioner suggests that the ALJ implicitly rejected Dr. Wagner's opinion when he adopted Dr. Egnor's opinion. However, the undersigned is unable to accept this premise in light of the absence of any mention by the ALJ of Dr. Wagner's statement regarding Claimant's disability. Moreover, the ALJ's written decision is sprinkled with small factual contradictions and inconsistencies, which undermine confidence in the presumption that the ALJ meticulously reviewed all of the evidence of record. Thus, the Court is left with an opinion by an examining medical source that differs greatly with the ALJ's RFC and disability findings, yet remains unchallenged by the ALJ.

While the undersigned conceivably could examine Dr. Wagner's opinion and find numerous reasons to discount or discredit it, that exercise would require the weighing of

evidence and the resolving of conflicts; tasks which simply are not within the scope of this Court's review. Likewise, this Court may not supply a rationale for rejecting an opinion where the ALJ has supplied none. *Patterson v. Bowen,* 839 F.2d 221, 225 n. 1 (4th Cir. 1988) ("We must ... affirm the ALJ's decision only upon the reasons he gave"); *Wilson v. Astrue,* 2010 WL 1534191 *4 (D. Kan. Mar. 31. 2010) ("a reviewing court may not create post-hoc rationalization to explain the Commissioner's treatment of evidence when that treatment is not apparent from the Commissioner's decision") (citing *Grogan v. Barnhart,* 399 F.3d 1257, 1263 (10th Cir.2005)). By failing to fully consider Dr. Wagner's opinion, assign weight to it, and explain how the conflicts in the evidence were resolved, the ALJ has made it impossible for the undersigned to determine whether his decision is based on a thorough review of the entire record and is supported by substantial evidence. Accordingly, the case should be remanded to allow the Commissioner an opportunity to consider and weigh Dr. Wagner's opinion in relation to the remaining evidence in the record. *See Saul v. Astrue,* 2011 WL 1229781 (S.D.W.Va. Mar. 28, 2011) ("the fact that the ALJ *might* have reached the same decision had he considered the entire record does not render his failure to consider the entire record harmless").

In addition, the undersigned finds that the ALJ's lack of attention to Dr. Wagner's opinion led to an incomplete credibility analysis. Because a claimant's statements about the intensity and functional impact of pain may suggest "a greater severity of impairment than can be shown by objective medical evidence alone," the ALJ must consider the statements carefully and in relation to the other evidence of record. SSR 96-7p, 1996 WL 374186 *1. The extent to which an individual's statements can be relied upon as probative depends upon the individual's credibility. "In basic terms, the

credibility of an individual's statements about pain or other symptoms and their functional effects is the degree to which the statements can be believed and accepted as true." *Id.* at *4. Social Security Ruling 96-7p provides guidance to an ALJ on how to assess the credibility of a claimant who alleges that his pain is disabling. According to the Ruling, the ALJ must follow a two-step process. *Id.* at *2. First, the ALJ examines the objective medical evidence to confirm whether there exists an underlying medically determinable physical or mental impairment that could reasonably be expected to cause pain. Once the ALJ establishes the presence of such an underlying physical or mental impairment, the ALJ must evaluate the intensity, persistence, and limiting effects of the pain to determine the extent to which the pain prevents the claimant from performing basic work activities. Whenever a claimant's descriptions of pain are not substantiated by objective medical evidence, the ALJ must make a finding of the claimant's credibility based upon consideration of the entire record. *Id.* at *2. One strong indicator of credibility is the consistency of the claimant's statements, "both internally and with other information in the case record." *Id.* at *5-6. Information recorded by medical sources regarding the onset, description, character and location of the pain, as well as the medical source's impression regarding the functional impact of the pain are extremely valuable to the ALJ's credibility assessment.

Here, the ALJ found Claimant's credibility to be "poor," explaining:

The claimant alleged disability as of December 2009 due to residuals from a leg fracture. However, the claimant did not fall out of the tree stand until early 2008. The claimant reported that his legs are different lengths, yet he does not wear special shoes or a leg brace for his conditions. Although [Claimant] receives follow-up care for his medical conditions, the undersigned finds his treatment regimen to be quite conservatively [sic]. Moreover, the claimant reports a history of various mental health issues. However, there is no evidence of mental health follow-up except for two sessions in 2009. Although the claimant testified that he had been sober

> for four years, the evidence notes otherwise. During a January 2009
> consultative evaluation, the claimant admitted to drinking two beers last
> New Year's Eve (Exhibit 13F). For these reasons, the undersigned finds the
> claimant's credibility to be poor.

(Tr. at 20). Had the ALJ paid closer attention to Dr. Wagner's evaluation, as well as the

other medical records in evidence, he would have clearly understood that Claimant was

alleging chronic musculoskeletal pain related to multiple injuries suffered in several

accidents, not just a leg injury from one accident involving a tree stand.[7] Similarly, the

ALJ would have been better able to recount an accurate chronology of Claimant's

injuries. Claimant's first accident occurred twenty years before the alleged onset of

disability and accounted for the hardware in Claimant's ankle and the rod in his femur.

Claimant next fell off of a ladder and into a glass window, causing him to lacerate

tendons in his right arm and leaving residual particles of glass in his right hand. Finally,

Claimant's fall from the tree stand occurred sometime around 2002-03 and resulted in

Claimant suffering a fractured neck and shoulder, not simply an injured leg as indicated

by the ALJ. It is the totality of these injuries that form the basis of Dr. Wagner's

February 2008 statement regarding the onset, character, location, and persistence of

Claimant's chronic pain. Because Dr. Wagner was the only medical source who treated

Claimant immediately after one of the accidents and was also the only medical source

who fully supported Claimant's assertions of disabling pain, the ALJ should have better

familiarized himself with Dr. Wagner's statement and compared it to the remaining

evidence when evaluating Claimant's credibility. Instead, the ALJ's credibility analysis

reflects confusion over the chronology of events and a misunderstanding of Claimant's

---

[7] At other points in the decision, the ALJ seems to appreciate that Claimant's applications are based on
"multiple musculoskeletal ailments," (Tr. at 17), but the ALJ assessment of Claimant's credibility does not
mirror that understanding and contains several factual discrepancies.

contentions and their consistency with Dr. Wagner's statement.

The ALJ's comment regarding Claimant's leg length discrepancy is equally puzzling. Claimant did not prompt the discussion of his leg lengths, nor claim that a leg length discrepancy was the source of his pain. Rather, an examining consultant made the observation that Claimant limped and measured Claimant's leg lengths, finding that his left leg was one centimeter shorter than the right leg. Thus, the discrepancy in Claimant's leg length was an objective medical finding, as opposed to a "claim" of Claimant, and should not have elicited the ALJ's skepticism. The fact that Claimant did not wear corrective shoes or use a leg brace may be useful in determining whether the length discrepancy caused pain, but given that Claimant did not connect his pain to the length of his left leg, that fact has no discernible relevance to his credibility. Ultimately, the ALJ was persuaded that Claimant's conservative treatment contradicted the alleged severity of his complaints. However, the ALJ did not consider that Dr. Wagner's conclusion regarding the severity of Claimant's pain was made at a time when Claimant regularly used prescription pain medication, thus begging the question of whether the conservative nature of Claimant's treatment was actually a valid indicator of the intensity of his pain. In summary, the ALJ's expressed reasons for finding Claimant's credibility to be poor are not well-supported by a close examination of the record.

Consequently, the undersigned concludes the ALJ's failure to reconcile Dr. Wagner's opinion with the remaining evidence in the case and the gaps in the ALJ's credibility analysis require a finding that the Commissioner's decision is not supported by substantial evidence and should be remanded for further administrative proceedings pursuant to sentence four of 42 U.S.C. § 405(g).

## VIII.  <u>Recommendations for Disposition</u>

Based on the foregoing, the undersigned United States Magistrate Judge respectfully **PROPOSES** that the United States District Court confirm and accept the findings herein and **RECOMMENDS** that the District Court **GRANT** plaintiff's motion for a remand as articulated in his Brief in Support of Judgment on the Pleadings (ECF No. 10); **DENY** defendant's Motion for Judgment on the Pleadings (ECF No. 11), **REVERSE** the final decision of the Commissioner, **REMAND** this matter pursuant to sentence four of 42 U.S.C. § 405(g) for further administrative proceedings, and **DISMISS** this action from the docket of the Court.

The parties are notified that this "Proposed Findings and Recommendations" is hereby **FILED**, and a copy will be submitted to the Honorable Robert C. Chambers, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure. The parties shall have fourteen days (filing of objections) and three days (mailing) from the date of filing this "Proposed Findings and Recommendations" within which to file with the Clerk of this Court, specific written objections, identifying the portions of the "Proposed Findings and Recommendations" to which objection is made, and the basis of such objection. Extension of this time period may be granted by the presiding District Judge for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to the opposing

party, Judge Chambers and Magistrate Judge Eifert.

The Clerk is directed to file this "Proposed Findings and Recommendations" and to provide a copy of the same to counsel of record.

**FILED:** September 12, 2012.

Cheryl A. Eifert
United States Magistrate Judge

22